IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA

V.     NO. 4:19CR00609-14 DPM

HECTOR VILLAGRAN

## MEMORANDUM AND ORDER

Before the Court is defendant Hector Villagran's ("Villagran") Motion for Immediate Release on Bond filed March 31, 2020 (Doc. No. 184). On November 6, 2019, Villagran was charged in a multi-defendant indictment by a grand jury in the Eastern District of Arkansas. He is charged with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.[1]

The United States alleges that in October of 2019, Villagran, a Texas resident, negotiated the sale of 10 kilograms of methamphetamine to Fred Martin ("Martin"), a resident of Central Arkansas and a co-defendant in this matter, in exchange for payment of $40,000. Agents were alerted to the negotiations because they intercepted a series of calls and text messages sent and received by

---

[1] Before he was indicted, Villagran and six others were charged in October of 2019 in a criminal complaint with conspiracy to possess with intent to distribute and to distribute controlled substances including methamphetamine, cocaine, and fentanyl (Doc. No. 1). An arrest warrant was issued for Villagran. The United States asserts that agents were

Martin's telephone.[2] See Doc. No. 1 at 3. The United States further alleges that on the night of October 13, 2019, Villagran sent a courier to transport and deliver the agreed-upon 10 kilograms of methamphetamine to Martin in Central Arkansas. The methamphetamine was delivered to Martin on October 14, 2019. Shortly after, the courier was traffic-stopped and was found to be in possession of the $40,000 Martin paid for the drugs. According to the complaint, a search warrant was executed at Martin's residence while the traffic stop took place, and 10 kilograms of methamphetamine were seized. Doc. No. 1 at 7-10.

Villagran was arrested in the Southern District of Texas, where he appeared for an Initial Appearance hearing pursuant to Fed. R. Crim. P. 5(c)(3) on February 3, 2020. Doc. No. 169. Counsel was appointed and Villagran requested a bond hearing. That hearing was held on February 6, 2020 before U.S. Magistrate Judge Christina A. Bryan, who entered an Order of Detention Pending Trial. *Id.* at 16-19. The detention order recognized that because Villagran was charged under the Controlled Substances Act with an offense with a maximum term of imprisonment of 10 years or more, a rebuttable presumption arose that no condition or combination of conditions would reasonably assure the appearance of the defendant and the safety of the community. *Id.* *See* 18 U.S.C. § 3142 (e)(3).

---

unable to locate Villagran to arrest him before the indictment was issued.
[2] U.S. District Judge Brian S. Miller signed an order authorizing the FBI to intercept wire and electronic communications to and from Martin's phone on September 25, 2019.

After hearing the evidence and the arguments of counsel, Judge Bryan first concluded that Villagran did not introduce sufficient evidence to rebut the above-described presumption. She then found, after considering the factors set forth in 18 U.S.C. § 3142(g), that the United States proved by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of the community, and by a preponderance of the evidence that no condition or combination of conditions of release would reasonably assure Villagran's appearance as required. Her reasons for detention included that the weight of evidence against Villagran is strong; Villagran is subject to a lengthy period of incarceration if convicted; Villagran has a significant prior criminal history;[3] he participated in criminal activity while on probation, parole, or supervision; he has significant family or other ties outside the United States; and Villagran had previously violated conditions of probation, parole, or supervised release. *Id.* Judge Bryan provided the following further explanation for her decision:

> Mr. Villagran is a citizen of both the United States and Honduras. He has substantial contacts with Honduras, which include a large number of relatives living in Honduras. He last traveled to Honduras in November 2019.

---

[3] The U.S., citing information received from the pretrial services office, states that Villagran has prior convictions of delivery of cocaine, possession of a firearm by a felon, possession of between 50-200 pounds of marijuana, and DWI. He also had a pending charge of intoxicated manslaughter with a vehicle. Doc. No. 191 at 3.

Villagran is charged with conspiracy to possess with the intent to distribute 500 grams or more of methamphetamine. The evidence against him is substantial. His conversations with co-conspirator Fred Martin have been captured on recordings authorized by a Title 3 wire intercept. The wire intercept captured six phone calls over the course of two days during which Villagran and Martin arranged the purchase of 10 Kilograms of "ice" or crystal methamphetamine for $4,000 per kilogram. Mr. Villagran was the supplier and Mr. Martin was located in Little Rock, Arkansas. They discussed price and timing of when the crystal methamphetamine would be delivered to Little Rock. On October 14, 2019, on another recorded phone call, Mr. Villagran told Martin the courier was 10 minutes away and indicated the courier would be in a black Ford car. Mr. Martin instructed Villagran to send the courier 20 Quillen Avenue in North Little Rock. Law enforcement was conducting surveillance and saw the black Ford go to the location. Agents conducting surveillance saw Mr. Martin leave his residence, cross the street and enter into 20 Quillen. They then saw Martin and the driver of the black Ford leave 20 Quillen. The black Ford was stopped after leaving 20 Quillen and contained $40,000 cash--the amount agreed upon during the recorded phone conversation for the sale of 10 kilograms of crystal meth. A search incident to Mr. Martin's arrest revealed 10 kilograms of crystal meth packaged in 1 kilogram containers. Villagran has been identified by a co-defendant and the courier as being involved in the transaction with Martin for the sale of 10 kilograms of crystal methamphetamine (50 grams is the amount required for the imposition of a 10-year minimum sentence to run concurrently to sentence imposed for other counts of conviction). In addition, Villagran participated in other recorded conversations discussing drug trafficking activity.

Villagran's criminal history is extensive and includes felony convictions for delivery of cocaine, theft, illegal possession of a firearm by a convicted felon, and possession of 50-2,000 [sic] pounds of marijuana. He is currently charged with intoxicated manslaughter. He has violated bond conditions on many occasions and had bond revoked on many occasions. He has also violated the terms of supervised release in the past. His multiple bond violations and conviction for possessing a weapon as a convicted felon indicate he is

> non-compliant with court imposed conditions. Villagran was arrested
> on these charges when he appeared at the Harris County Courthouse
> in a case in which he is charged with vehicular homicide, a charge
> which in and of itself, demonstrates that he poses a danger to the
> community.
>
> Villagran proffered that he does not pose a risk of flight because he
> has many family members in this district, including a son that was
> born with a heart defect and requires ongoing treatment. The
> Defendant also proffered that his release was needed in order for his
> son to receive needed medical care. The Defendant introduced as an
> exhibit a letter from a physician at Texas Children's Hospital stating
> that the Defendant's son underwent heart surgery in 2013 and requires
> continued medication. However, the letter states that his son is stable
> and the letter does not state that Villagran's release is required for his
> son to attend appointments. In fact the Defendant has been in and out
> of custody multiple times since his son's 2013 heart surgery. The
> court does not find the proffer of his son's heart condition sufficient to
> overcome the presumption that the Defendant poses a risk of flight.
>
> The Court finds that there is no combination of conditions that can
> reasonably assure the appearance of the Defendant in the Eastern
> District of Arkansas and the safety of the community.

*Id.* at 18.

Villagran is currently in federal custody at the West Tennessee Detention Facility ("WTDF") in Mason, Tennessee.

Villagran seeks immediate release on bond pursuant to 18 U.S.C §3142(i) in light of the COVID-19 pandemic. That statute provides that the court may permit the temporary release of an individual in custody "to the extent the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Villagran does not claim to suffer from any of the

medical conditions designated by the Centers for Disease Control ("CDC") as most at risk for contracting COVID-19, nor is he 65 or older. His claim is based on an argument that he is at higher risk for contracting COVID-19 because he is in a prison setting. He states that "[t]he coronavirus is spreading quickly through the United States's jails and prisons, where social distancing is impossible and sanitizer is widely banned, prompting authorities across the country to release thousands of inmates in recent weeks to save lives and preserve medical resources." Doc. No. 184 at 3.

The Court is guided by the well-reasoned order entered by Magistrate Judge Jerome Kearney in *United States v. Lunnie*, Case No. 4:19-cr-180 KGB, filed April 2, 2020, Doc. No. 35. In that order, Judge Kearney denied an inmate's request for temporary release from custody due to the COVID-19 pandemic after considering a number of factors, finding those factors did not constitute a compelling reason for release. He stated:

> The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents. But, in that context, a defendant should not be entitled to release under § 3142(i) based solely on generalized COVID-19 fears and speculation. Rather, the court must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary under § 3142(i). In making that determination, the undersigned will evaluate at least the following factors: (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's COVID-19 concerns, (3) the extent to

> which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a "compelling reason" exists such that temporary release is "necessary."

*Id.* at 3 (quoting *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kan. Mar. 25, 2020)). Based on the evidence before this Court and analysis of the factors cited above, the Court finds that Villagran has not established a compelling reason that necessitates his temporary release.

### 1. Original Grounds for Pretrial Detention

The underlying reasons for Villagran's detention are relevant to the Court's § 3142(i) analysis. *See Lunnie*, at 3-4 (citing *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020); *United States v. Buswell*, No. 11-CR-198-01, 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013); *United States v. Dupree*, 833 F. Supp.2d 241, 247 (E.D.N.Y. 2011)). And if a federally-charged defendant is detained following a bond hearing, a court has already found by clear and convincing evidence that no conditions or combination of conditions can reasonably assure the safety of the community, or by a preponderance of the evidence that no conditions or combination of conditions can reasonably assure the defendant's appearance, or both. The court's reasons for detaining the defendant must be considered "in determining whether a defendant

has presented such compelling reasons for release that they effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order." *Lunnie*, at 4.

Here, following a bond hearing, Judge Bryan found that Villagran failed to rebut the presumption that there are no conditions or combination of conditions to reasonably assure the safety of the community or his appearance. She cited with specificity the reasons, set forth above, for her findings. Those reasons included that the weight of the evidence against Villagran is strong – the charge against him is supported by wiretap intercepts, testimony by co-conspirators, and the seizure of 10 kilograms of methamphetamine and the $40,000 paid for it; that Villagran is facing a lengthy period of incarceration, at least 10 years, if convicted; that Villagran has an extensive criminal history that includes drug and firearm convictions; that Villagran participated in criminal activity while on probation, parole, or supervision; that Villagran has significant family ties in Honduras, is a citizen of Honduras, and had recently visited there; and that Villagran has a history of violating conditions of probation, parole, or supervised release. Judge Bryan's findings are amply supported by the record before this Court. The existence of the COVID-19 pandemic does not alter the findings made by Judge Bryan. Villagran remains a flight risk and a danger to the community.

    2.    **Specificity of Villagran's COVID-19 Concerns**

Villagran does not claim to be an individual at high risk for severe illness due to any medical condition or his age.[4] The United States indicates that, according to the pretrial services report, Villagran is 34 years old and in good health. Doc. No. 191 at 6. The sole basis for his motion for immediate release is that he is at greater risk of contracting COVID-19 because he is incarcerated. He claims that at WTDF he is housed in an open 40-person pod, that inmates share chairs, eat at the same tables together, share 4 telephones, and are locked in small two-person cells at night. Doc. No. 184 at 5. Villagran states that these conditions "create the ideal environment for the spread of a highly contagious disease like COVID-19." *Id.*

Villagran further states that inmates "cycle in and out" of the facility, and that employees leave and return without being screened. *Id.* at 6. WTDF is reportedly following CDC guidelines for screening of detainees and staff, screening and taking the temperature of all detainees coming in and leaving WTDF, screening and taking the temperature of personnel entering the facility, and has developed emergency plans and isolation plans for COVID-19 in the event of positive results. See Doc. No. 191-4. The United States represents that additional measures have been taken by WTDF, including cancellation of social

---

[4] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html for a listing of medical conditions that place COVID-19 infected-persons at higher

visits, requesting that attorneys use non-contact visitation, providing sanitary wipes to attorneys who use contact visit areas, no longer transferring inmates within the facility, wiping down hard surfaces in housing units every two hours with disinfectant wipes, wiping down restraints before and after use, and placing signage throughout the facility reminding inmates and employees about hygiene and social distancing measures. Doc. No. 191 at 7.

At the time the United States' response was filed on April 3, 2020, there were no inmates at WTDF diagnosed with COVID-19. That fact has now changed. The Court was advised on April 9, 2020 that one inmate at WTDF has tested positive for COVID-19. Reportedly, WTDF is assessing how many individuals may have been exposed. Transports to and from WTDF have been suspended pending completion of the assessment. The Court expects that WTDF's continuing assessment will soon identify when the infected prisoner was admitted, where he was housed, when he began to exhibit symptoms, and what individuals may have been exposed to him.

Villagran's counsel filed a supplemental reply on April 10, 2020 indicating that, according to a phone call from a friend of Villagran, there are 3 confirmed cases of COVID-19 at WTDF, and the jail staff removed a sick man who had symptoms associated with COVID-19 and who was confined in the same

risk.

40-person pod as Villagran. Doc. No. 195 at 1-2. He argues that the diagnosis of a prisoner at WTDF with COVID-19 tips the scale in favor of Villagran's release under the most strict of conditions. The Court does not agree. Villagran's position is based on unconfirmed allegations and speculation at this time. There is no evidence before the Court of when the infected inmate was admitted, whether the infected inmate was housed with and/or in contact with Villagran, and specifically whether Villagran was or could have been exposed.

The Court recognizes that the COVID-19 pandemic is an extraordinary situation and that it presents significant and serious health risks to the community, and especially to older individuals and those with certain preexisting conditions. But Villagran does not possess those identified high-risk factors. And the greater risks presented to incarcerated individuals are also present for a number of persons who are not incarcerated, including frontline health care providers, and employees and patients in hospitals and nursing homes. Under the circumstances presented, the fact of incarceration alone and the greater risks it presents do not tip the scale in favor of release in light of the risks to the community and of nonappearance Villagran presents.

### 3. The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate Other COVID-19 Risks to Villegran

Villagran proposes to be released to the third party custody of his brother in

Houston, Texas. The brother lives in a home with his wife and two children. The release plan proposes that Villagran would live in a guesthouse behind his brother's house where he would self-quarantine. It is unclear what contact, if any, Villagran would have with his brother, sister-in-law, and nieces/nephews. There is no evidence concerning whether any of these individuals are at high risk, whether individuals who frequent the home or guesthouse are at high risk, whether these individuals have had contact with persons who have COVID-19 or been exposed to it, or what COVID-19 precautions are being taken by these individuals. Additionally, Villagran has not established that WTDF is unprepared to protect him, or to care for or obtain care for individuals who have contacted or may contract the virus. Finally, Villagran offers no information regarding the exposure risk his pretrial services officer faces should he be released. The Court finds that it would be required to engage in speculation in order to find that temporary release would result in a safer environment for Villagran.

4. **The Likelihood that Villagran's Proposed Release Plan Would Increase COVID-19 Risks to Others**

In *Lunnie*, Judge Kearney stated that a consideration of this factor should take into account the likelihood that the defendant will violate conditions of release, and therefore increase COVID-19 risk to others. *See Lunnie*, Case No.

4:19-cr-180 KGB, filed April 2, 2020, Doc. No. 35 page 10.  Releasing Villagran with location monitoring and on home incarceration does not guarantee his compliance with conditions of release.[5]  And if he violates such conditions, he would place himself at risk of infection as well as law enforcement officers, pretrial services officers, and others with whom he comes into contact.[6]

The Court is not confident that Villagran will comply with any conditions of release.  He has failed to comply with conditions of release in the past.  He has a significant criminal history.  He is currently facing a serious drug charge in this case that will result in significant prison time if he is found guilty, as well as a vehicular manslaughter charge.  He is a citizen of and has significant ties to Honduras.  The Court has no reasonable basis to find that Villagran will decide to comply with any conditions of release under these circumstances.

If Villagran is released to home incarceration with location monitoring, pretrial services employees will be required to install and monitor such technology,

---

[5] "While the location monitoring that he proposed may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection."  *Id.* (quoting *United States v. Martin*, 2020 WL 1274857, at *4 (D. Md. March 17, 2020)).

[6] The Court also notes that, according to Villagran's supplemental reply, he believes he may have been exposed to the COVID-19 virus while in custody (Doc. No. 195).  While the Court finds this assertion to be speculative at this time, if it in fact is found to be accurate, releasing Villagran would certainly increase COVID-19 risks to others with whom he may come into contact in the outside world.

placing those individuals at greater risk of contracting and spreading COVID-19. If he violates conditions, law enforcement officers will be required to locate him, take him into custody, and return him to custody, placing them at greater risk of contracting and spreading COVID-19. Then when he is returned to custody, the detention facility employees and inmates will also be placed at greater risk of contracting and spreading COVID-19. These circumstances weigh in favor of denying Villagran's motion for temporary release.

## Conclusion

For the reasons stated herein, Villagran has failed to establish compelling reasons that would necessitate his temporary release. Thus, the Court denies the motion for temporary release.

IT IS SO ORDERED this 13th day of April, 2020.

_____
PATRICIA S. HARRIS
UNITED STATES MAGISTRATE JUDGE